Filed 2/13/14  In re A.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E059506 |
| Plaintiff and Respondent, | (Super.Ct.No. JUV-084587) |
| v. | OPINION |
| A.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, Carole A. Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

1

A.C. (father), the father of A.C. (child), appeals from an order of the dependency court terminating his parental rights. The child's mother is not a party to the appeal.

On appeal, father contends that there is insufficient evidence to support the court's finding that the beneficial parent-child relationship exception to termination of his rights did not apply. We disagree and affirm the judgment.

PROCEDURAL AND HISTORICAL FACTS

On November 18, 2011, a search warrant was served at the residence of mother and father. Father was located in a backyard shed in possession of methamphetamine and marijuana. Mother and the then 15-month old child were found in a bedroom along with an aunt. A pipe used for smoking methamphetamine was found on a desk. It was still warm and smoking. Mother and father were both arrested for being under the influence of methamphetamine. The aunt lied and said that she was the mother of the child because she thought that she was not going to be arrested. Presumably, she lied to avoid the child being taken into protective custody. She was also arrested, however. Mother, father and child were all dirty and disheveled.

Father had previously been convicted of felony possession of controlled substances in 2009 and admitted occasional use of methamphetamine, but he stated that he did not have a substance abuse problem. He admitted to using methamphetamine that morning and that he began selling drugs to make extra money. He was aware that mother used methamphetamine but stated that he was unaware that she had smoked it that morning in the presence of the child. Later, he admitted to a 21-year history of drug

2

abuse and engaging in drug sales. He entered a substance abuse program on December 12, 2011, apparently on his own volition.

Mother had a long history of drug abuse and a long prior history with the dependency court. She had failed to reunite with her other children by other fathers. Two were adopted. Two were placed in guardianship. One was returned to her father who was given sole custody. One died but apparently not due to neglect. Mother also had a history of criminal convictions. In 2004, she was convicted of being under the influence of a controlled substance, a misdemeanor. In 1994, she was convicted of felony child endangerment and received formal probation.

The child was born three weeks early in July 2010. Mother tested positive for methamphetamine. The child was placed in intensive care for upper respiratory distress. Mother stated that she wanted to give the child up for adoption, but mother was married to father and he would not consent.[1]

Father reported that he asked mother to move out of their home, and father then obtained a family law court order for sole physical and legal custody on September 29, 2010.[2] Mother did not appear at the custody hearing so no visitation order for mother was made by the family law court. Father was not named the biological father on the birth certificate, but he admitted that he was the father.

_____

[1] Mother and father reported they had lived together for five years before they married on May 22, 2010, two months before the child was born.

[2] Although father had sole legal custody of the child, he allowed mother to remain in the home with the child, and she was permitted to care for the child unsupervised.

Fourteen months after father was awarded sole legal and physical custody, mother and father were arrested at the family residence. A petition was filed on behalf of the child on November 22, 2011, pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (g).[3]

A detention hearing was held on November 23, 2011, and the child was detained in foster care. The court found father to be the presumed father at this hearing.

A contested jurisdictional hearing was held on March, 20, 2012, and the allegations in the amended petition were found true.

The dispositional hearing was held on April 23, 2012. Both mother and father were denied reunification services. The child was ordered into foster placement. She was placed with her prospective adoptive parents on June 20, 2012. She had been doing well in that placement.

Father filed a section 388 petition alleging changed circumstances on August 17, 2012. Father had sought out a number of services and programs, apparently on his own initiative. The court ordered a hearing on the petition.

On October 1, 2012, the court granted father's petition and granted reunification services and liberal visitation to include overnight visits and weekends also. Weekly unsupervised day visits with father began approximately at the end of the year. The court ordered that mother and father not visit the child at the same time.

---

[3] All further code references are to the Welfare and Institutions Code. After their release from jail, the section 300, subdivision (g), allegations were dropped in the amended petition.

The weekly day visits with father were reported to have gone well. The child would return to foster care in good spirits and did not demonstrate adverse behaviors after visits. However, after two overnight visits, she regressed and soiled herself even though she was potty trained. She was clingy with the foster parents. She would not go to sleep and would cry for her foster parents when visiting father. Father had to call the foster parents and have them talk with the child before she would go to sleep. During the child's supervised visits with mother, the child was uncomfortable and distant from mother, and there was limited interaction by mother with the child. After unsupervised visits with father began, the child began to respond more positively to her mother during their supervised visits. Interaction with mother and the child seemed comfortable.

On Saturday, March 30, 2013, at 7:55 a.m., the social worker made an unannounced visit at father's home because she suspected that mother was visiting during the unsupervised weekend visits with father. Mother was at the home, in violation of a court order. The child was there visiting with father. Father claimed that mother had just arrived unannounced to drop off an Easter dress for the child and did not know that the child was there. Easter was the next day. Father said that he cannot control mother, and she just shows up. Father asked for the social worker to give him a break and just call it a supervised visit. The social worker told father that she did not believe mother had just arrived and that she believed that mother had been visiting during the father's weekend visitations. He replied that it was not the first time that mother had been at the home when the child was present. The social worker reiterated that the child cannot be around mother due to her substance abuse issues and that the department was concerned that

5

despite his commendable progress in addressing his issues, he did not seem to understand the need to keep the child safe and protected from mother.[4] The child was taken by the social worker.

The next day, March 31, 2013, father made a 911 call to report that mother had shown up at his house uninvited. The social worker investigated and corroborated that such a call was made from father's mobile phone. Two days after the unannounced visit, father obtained a temporary restraining order to keep mother away.

A review hearing was held on May 23, 2013. Reunification services were terminated and a section 366.26 hearing date was set.[5] Previously, before the unannounced visit, the social worker had recommended that father regain custody of the child with maintenance services provided in a report filed March 20, 2013, just 10 days before the unannounced visit.

Father filed another section 388 petition on June 28, 2013, requesting custody or further reunification services.

The termination hearing was held on July 8, 2013. Mother was not present. The court summarily denied father's new section 388 petition. The child's current foster parents wanted to adopt her. Father and mother's attorneys both objected to termination

---

**4** From the outset of the dependency, mother stated that she did not want reunification services, and she wanted father to regain custody of the child.

**5** Apparently, no writ review was sought of the court's order terminating reunification services and setting the termination hearing.

of parental rights and requested guardianship as the permanent plan. The court found that no exceptions to adoption applied and terminated parental rights.

## DISCUSSION

Father's sole contention on appeal is that there is no substantial evidence to support the court's finding that section 366.26, subdivision (c)(1)(B)(i), the beneficial parent-child relationship exception to adoption, does not apply. We disagree.

Once reunification services have been terminated, the focus shifts to the needs of the child for permanency and stability. (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309.) Adoption is the legislated preferred plan for a child who cannot be returned to parental custody because it provides the permanency which other alternatives, such as guardianship or long-term foster care, cannot. (*In re Scott B*. (2010) 188 Cal.App.4th 452, 469.) The statutory exceptions to the preferred plan of adoption merely permit the court in exceptional circumstances to choose an option other than the norm, which is adoption. (*In re Celine R*. (2003) 31 Cal.4th 45, 53.)

The parent has the burden of proving that one of the exceptions to adoption apples. (*In re Scott B*., *supra*, 188 Cal.App.4th at p. 469.)

The applicable standard of review is somewhat muddled. Some courts have used an abuse of discretion standard while others have used a substantial evidence standard. (*In re Scott B.*, *supra*, 188 Cal.App.4th at p. 469.) Recent cases have applied a substantial evidence standard to the court's factual determination of whether there is a parent-child beneficial relationship and an abuse of discretion standard to the court's determination that termination of rights would not be detrimental to the child. (*In re K.P*.

(2012) 203 Cal.App.4th 614, 621-622, citing *In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314-1315.) As a practical matter, it makes no difference which iteration of the standard we apply. Whether we apply an abuse of discretion standard of review or a substantial evidence standard of review, or a combination of those, we find the court did not err in finding the exception did not apply and in terminating parental rights in this case.

It is unquestioned that father regularly visited the child, and the visits generally went well with the child demonstrating much affection for her father. The pertinent issue then becomes whether the child would derive a greater benefit from continuing the parent-child relationship with father than she would from being adopted. (*In re B.D*. (2008) 159 Cal.App.4th 1218, 1234.)

*In re Autumn H*. (1994) 27 Cal.App.4th 567 is the seminal case regarding exceptions to the preference for adoption. There, the court held parent-child relationships that can prevent termination of parental rights are ones that promote ". . . the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Id*. at p. 575.)

8

"The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond.  The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.)

Adoption cannot be thwarted simply because a child would derive some benefit from continuing the parent-child relationship, and adoption should be ordered when the court finds that the relationship maintained through visitation does not benefit the child significantly enough to outweigh the strong preference for adoption.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Neither father nor mother presented any affirmative evidence at the termination hearing.  There was no bonding study.  Everyone submitted on the reports prepared for the hearing.  At the time of that hearing, the child had been out of her father's custody for about 20 months.  She was removed from parental custody when she was 15 months old.  Her one-on-one visits with father went well and were appropriate and affectionate.  She was not upset or crying, however, when visits were over and she had to return to her caregivers.  She enjoyed a bonded parent-child relationship with her adoptive parents and was thriving and happy in their home.  The other children in the family related to her as a sibling.

Father had progressed to unsupervised visits for a brief time, but that status was revoked upon finding mother at father's home early on a Saturday morning in violation of a court order. The child was taken by the social worker, and visits reverted to supervised.

There is no evidence in the record demonstrating that severing the parent-child relationship would be detrimental to the child. On the contrary, there is evidence that the child would be at risk if ever returned to father's custody and the dependency terminated.

The elephant in the room is mother. Mother has a long history of substance abuse and involvement with the dependency system, and there is nothing in the record to suggest that she has sought help for her drug abuse since the birth of the child. Mother tested positive for methamphetamine at the birth of the child. Mother initially stated that she wanted to place the child for adoption. Later, mother stated she wanted father to have custody, and she did not want to participate in services for herself.

Father did get sole physical and legal custody from the family law court, yet he continued to reside with the drug abusing mother until they were both arrested while under the influence of methamphetamine when the child was 15 months old and the dependency petition was filed. He has admitted to allowing mother to care for the child unsupervised after getting the family law sole custody order.

On this record, it appears that father is either unwilling or incapable of severing ties to mother or otherwise stop associating with her. They are married, and there is nothing in the record to indicate that father intends to divorce mother. If father regained custody and the dependency were to be terminated, the child would not be protected from mother. Even with protective exit custody orders for the child, the father could simply

10

ignore them to the detriment of the child, if he chose to do so, and as he has done in the past.

Father admitted when mother was caught at his home during the child's unsupervised visitation with father that it was not the first time it had occurred. Mother admitted to going to the house when the child was there for unsupervised overnight weekend visits. Father has demonstrated that he is willing to violate court orders and that he is willing to subordinate the child's safety and need for protection to his apparent need to stay involved with mother who poses a risk to the child.

The benefits of continuing the relationship with father do not outweigh the benefits she would obtain in a stable and secure new adoptive family, and termination of rights will not be detrimental to the child. The record does not show that the court abused its discretion, and substantial evidence supports the court's findings and orders under any iteration of the standard of review. The court did not err.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

HOLLENHORST
Acting P. J.

CODRINGTON
J.

11